UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br> v.<br><br>MARCUS FENWICK,<br><br>    Defendant. | Case No. 19-cr-184 (TNM) |

MEMORANDUM IN AID OF SENTENCING

## Background

Mr. Fenwick has now been under community supervision for almost a year. During that time, Mr. Fenwick has demonstrated that he is clearly a person who can succeed while on supervision. He has not incurred any infractions. Prior to the COVID-19 pandemic, he was gainfully employed doing general maintenance work—which was confirmed by Pretrial Services. As is the case for millions of Americans, the pandemic brought an end to Mr. Fenwick's employment. This, however, has not stopped him from continuing to search for other jobs. He has submitted numerous job applications, and is hopeful that he will soon be employed again. Mr. Fenwick has also kept his focus on the services he knows will help him stay on track: he attends both mental health and substance abuse treatment. Mr. Fenwick has not tested positive for any illicit substances.

From the moment Mr. Fenwick was released to Hope Village, he has been dedicated to turning his life around. During his five months at the halfway house, he completed the D.C. Career Connections Program, a job readiness program designed to help people learn new skills along with providing individualized support in their journey to gaining employment. Through this program, he obtained employment at Giant Supermarket.

Mr. Fenwick has been fortunate in having a strong support system help him out along the way. Both his mother, Victoria, and his fiancé, Markeisha, have been extremely supportive. When news arrived that Mr. Fenwick and Markeisha were expecting a child, the family was ecstatic. Mr. Fenwick especially, since this would

be first child. Tragically, Markeisha lost the baby earlier this year as a result of a miscarriage. This was a devastating moment that they continue to heal from. Given the tragic history between him and his father, Mr. Fenwick looks forward to being the best dad he could possibly be. A dream he hopes to realize soon.

Although Mr. Fenwick accepts full responsibility for his actions, the conversation regarding Hope Village is never complete without discussing the notoriously horrendous conditions of the halfway house. In April of this year, two men died within one weekend at Hope Village.[1] A few days later, they unexpectedly announced they would be closing down within a few weeks. While their inability to handle the pandemic may have ultimately forced their hand, the closing of Hope Village was a long time coming. Community advocates have long cited "[r]eport after report [showing] that the conditions there are inhumane, and [hope village] has proven itself unable or unwilling to correct course."[2]

Safety has always been a problem at the halfway house. Residents live in fear as many people have been "robbed, assaulted, and even murdered inside Hope Village and in the surrounding neighborhood."[3] Some people avoid Hope Village altogether and would rather serve out the rest of their sentence in a federal prison.

---

[1] Jenny Gathright, *Two People Died At D.C.'s Men's Halfway House Over The Weekend* (April 6, 2020), https://wamu.org/story/20/04/06/two-people-died-at-d-c-s-mens-halfway-house-over-the-weekend/.

[2] James Wright, *Hope Village Remains Open for Business — For Now* (Oct. 16, 2019), https://www.washingtoninformer.com/hope-village-remains-open-for-business-for-now/.

[3] Eric Thompson-Bey, *Is it over for Hope Village, the last men's halfway house in DC?* (Sep. 18, 2019), https://www.streetsensemedia.org/article/is-it-over-for-hope-village-the-last-mens-halfway-house-in-dc/#.X4jSbdBKg2w.

2

Chronic problems in the neighborhood in which Hope Village is located contribute to the danger that residents must endure. Metropolitan Police Department records indicate that within the period of January 17, 2018 and January 17, 2019, 66 crimes were reported within 1000 feet of Hope Village. 33 of those being violent crimes (including a total of 3 homicides and 23 assaults with a dangerous weapon). *See* Metropolitan Police Department Crime Map.[4] And these numbers reflect only those crimes which were reported to the police department. It is worth noting that it takes the average person less than five minutes to walk 1000 feet.

Mr. Fenwick does not offer this information as an excuse, but simply to offer context to the situation at Hope Village. It also explains why someone living under these conditions would have no confidence that a matter regarding their safety or any other problem would be addressed appropriately.

As a result of Mr. Fenwick's decision, he served an additional 30 days in jail—time he would not have otherwise served. He spent this time in jail over Christmas, away from his family and most importantly his fiancé, who was expecting their first child. Mr. Fenwick, however, will not receive credit for that time on any sentence he receives from this Court.

A sentence of time served accounts for the time Mr. Fenwick has already served and recognizes the progress that he has made and will continue to make if he remains in the community. Not only will it allow him to remain connected to the

---

[4] This map, which is updated regularly, can be found at https://dcatlas.dcgis.dc.gov/crimecards.

3

services he needs, but it would allow him to remain connected with his family and support system. Whereas additional incarceration, even if only for a few months, will only serve to disrupt his progress and force him to start from square one when he is released. Due to the pandemic, there are no rehabilitative services available at the jail. Mr. Fenwick will spend most of his days locked in a cell 23 hours a day, leaving him without important services and an extremely limited, if any, connection to his family. All while exposing him to a deadly virus that could have severe consequences for him due to his Asthma condition.[5]

## Sentencing Legal Framework

In sentencing, the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution

---

[5] Mr. Fenwick's condition was confirmed in the pre-sentence report. *See* ECF No. 21 at 48.

4

to any victims of the offense. *Id.* § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

When sentencing a person, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s

5

objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id.* at 358.

## Discussion

### A. *Mr. Fenwick's History and Characteristics*

Mr. Fenwick grew up in an environment surrounded by trauma. When he was just a toddler, his father was sent to prison for sexually assaulting Mr. Fenwick's sister. A harrowing experience that brings him pain to this day. Things did not get any easier from there. Though not for lack of trying, Mr. Fenwick's mother was simply unable to adequately provide for him and his siblings. Mr. Fenwick would often go hungry—having nothing but school lunch to hold him over. Additionally, the family often lacked basic necessities needed in any home with small children.

When Mr. Fenwick was 15 years old, his older brother, Troy, was murdered in front of him. After this tragic loss, he began battling depression and in turn fell deeper into the cycle of substance abuse. In addition to battling trauma, depression, and substance abuse, Mr. Fenwick began feeling the pressure of helping to provide for his family. Unable to cope with the stress that was consuming him, Mr. Fenwick turned to the streets and made some decisions that he will regret for the rest of his life. These regretful decisions sent him to a federal prison for 5 years at barely 20 years old.

Barely out of his teenage years, his youth at the time is an extremely important factor when considering Mr. Fenwick's prior contact with the criminal justice system. The Supreme Court has recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted). The Court has concluded that, because of these qualities, juveniles "have diminished culpability and greater prospects for reform." *Id.*; see also *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005).

Research shows that "psychosocial capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood." Thus, "young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses."[6] In evaluating Mr. Fenwick's past, the Court should give great consideration to his youth, trauma, and substance abuse problems—and the devastating effects of all those things combined.

---

[6] Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of Justice, U.S. Dep't of Justice (May 2014) at 2.

Despite his troubled youth, Mr. Fenwick is excited at what the next chapter of his life will bring. He remains active in programing and services that will give him the tools to better his life and has worked hard to maintain employment. Mr. Fenwick also hopes to continue his education and receive his certifications in HVAC, plumbing, and welding.

Mr. Fenwick turned himself in on this matter. He agreed to accept responsibility within two months of his initial appearance. While he is excited about the next chapter in his life, he hopes to put this one behind him soon.

B. *The COVID-19 Pandemic*

The advent of the COVID-19 pandemic has affected sentencing decisions in a marked way. It has altered the landscape for sentencing in every conceivable way. With COVID-19, it is necessary to examine 18 U.S.C. § 3553(a) in a more deliberate way. Incarcerating Mr. Fenwick, when he will have no access to communication, programming, and rehabilitative resources and faces enormous risk to his health is not necessary to meet the goals of sentencing.

Mr. Fenwick not only will be on lockdown, prohibited from seeing his family and unable to engage in rehabilitative or productive programming, but he will also be at grave risk of contracting COVID-19. Mr. Fenwick suffers from Asthma—which places him at risk of severe complications or death if he were to contract the virus. CDC guidance, such as social distancing, is simply impossible to achieve in correctional settings—particularly during a lockdown. Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in

close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.

One of the fundamental purposes of sentencing is rehabilitation. But rehabilitation is currently impossible in at the D.C. Jail. If he is incarcerated, Mr. Fenwick will be unable to receive programming and rehabilitative resources, such as the ones he is currently receiving, and instead, will be confined in his cell usually for 23 hours a day. Incarceration under these circumstances is counterproductive at best and harmful at worst.

### C. Mr. Fenwick's Criminal History is Overstated

Mr. Fenwick's criminal history criminal history score is increased by two points under U.S.S.G. § 4A1.1(d) because he was under a criminal justice sentence when he committed the offense—a fact that is necessarily true because of the nature of the charge. Being under a criminal justice sentence is an element of the offense of escape; Mr. Fenwick could not have committed escape had he not been under a criminal justice sentence. This form of double-counting inflates the advisory sentence without any sufficient justification. If not for the double counting, Mr. Fenwick would be one category lower, with a recommended sentence of two months on the low end.

## Conclusion

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Fenwick respectfully requests that the Court impose a sentence of time served, or alternatively, a sentence of probation. Mr. Fenwick already spent a month in jail for his actions. Additional incarceration, in this case, does nothing to further the ends of justice.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Jose A. German
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500